## Haverly *versus* Mercur.

| 78 | 257 |
| 132 | 96 |

| 78 | 257 |
| f 19 SC | 422 |

1. Evidence to change a contract relation between plaintiff and a third party and to prove a promise to pay the debt of another as a new and original undertaking and not a contract of suretyship, must be clear and satisfactory; otherwise it will fall within the Statute of Frauds.

2. On a judgment of nonsuit the court below being better able to judge of the force of the evidence, the necessity of a clear and preponderating weight of evidence in favor of an absolute, original and personal promise, is greater where the court of error is called upon to reverse the judgment.

of the lower court; it should plainly appear that the plaintiff had a case that should have gone to the jury.

3. The evidence in this case not sufficient to go to the jury on the question whether the promise of defendant was a personal undertaking and not within the Statute of Frauds.

4. Where a nonsuit is entered in the court below, a writ of error lies only to the refusal of the court in banc to take it off. A writ of error directly to the judgment of nonsuit will be quashed.

5. Eshleman *v.* Harnish, 26 P. F. Smith 97, followed. Jefferson Co. *v.* Slagle, 16 P. F. Smith 202, distinguished.

March — 1875.  Before AGNEW, C. J., SHARSWOOD, WILLIAMS, GORDON, PAXSON and WOODWARD, JJ.  Mr. Justice MERCUR, being related to defendant, did not sit.

Error to the Court of Common Pleas of *Bradford county:* Of January Term 1874, No. 210.

This was an action of assumpsit, brought November 7th 1870, by Amasa Haverly against Mahlon C. Mercur.  The plaintiff's claim was as follows:—

The firm of Whittenhall & Co., composed of Whittenhall and Andrews, were contractors to build the Sullivan and Erie Railroad, in the counties of Sullivan and Bradford; the defendant was president of the railroad company; the plaintiff was a sub-contractor for the construction of two sections of the road.  His allegation was that Whittenhall & Co. had not paid him the estimates when they became due; that he complained to the defendant that he was unable to carry on the work because the prices were too low, and because he was not paid, and that he would be compelled to discharge his hands and abandon his contract; the defendant told him to continue at the work and finish the sections and he would see him paid; that in consequence of this promise he did continue at the work and finish the sections, but the defendant had refused to pay him.

The promise was not in writing; the question was, whether under the facts in the case, it was within the Statute of Frauds.

The case was tried December 9th 1873, before Streeter, P. J.

The plaintiff testified that he commenced work under his contract with Whittenhall & Co., and continued for three or four months, as long as he had the means.  In February he told the defendant that it did not pay, and he was not getting any money; defendant said he had better keep on; he afterwards heard that Whittenhall was good for nothing; he told defendant, and said he would not work any longer under him, and should quit.  Defendant told him that he was living there, raising his own provisions, and had better go on and build the road.  Defendant said, "he would tell me what to do, I should go to work, keep a strict account of everything I put on the road, and return it to Everett (the superintendent of Whittenhall & Co.), and he, defendant, *would pay me or see that I had my pay.*  He said I should not

[Haverly *v.* Mercur.]

lose one cent by it; told me this was confidential. * * * I went back and went to work on the road again; I completed the job about December 1st 1869. I had the conversation with Mr. Mercur when I agreed to go on in March 1867. * * * There was due me about $12,000. * * *

"I had a conversation at the bridge when I had got the abutments pretty well along; he thought I was getting along well; I told him the men were dissatisfied at not getting their pay, and were leaving me. He said he had told me that I should lose nothing, and told the men they should not be afraid of me, as I was the only man that could pay gold. * * * Had a conversation with Mercur in the latter part of November or first of December 1867. I was in the stage going down to see Mercur. Others were stopping work, and I was going down to see if I had not better quit. I told him I was going down to see him to know if I had not better stop work. * * * He told me it would not do to stop work on the rock job. I told him I could not carry it on, as my resources were exhausted. He told me to come down with a team and he would see about getting a load of provisions; I did so. He went with me to Mix & McCabe's, and told them to let me have a load of provisions, and he would see that they had their pay. I got provisions there at different times nearly all winter. * * *

"He told me to keep my charges for expenses as I had done; I told him I had done so except for ox-team work. He told me at different times to get all I could out of Mr. Andrews, and that it would not hurt me. He wanted this to be kept confidential, because others would be trying to get him to secure them. This account includes charges for my own time, except for about three or four months. I put in my own time, because he told me to keep a strict account of everything. This account is a correct one.

On cross-examination he said : * * * "I signed receipts when I got the money of Whittenhall & Co. I received money from them a good many times ; sometimes once a month, sometimes once in two or three months, as long as I worked there. * * * It was estimated that my whole work would come to $35,990.70. They could not make an estimate of the amount of work done by me after the slide. I presumed that Everett and Dodd informed me after the slide that they would have to estimate the amount of work by the quantity each man done daily. After this occurred they paid me from my pay-rolls. I returned my pay-rolls to Mr. Everett every month. I continued to get money from him from time to time as long as I worked there. * * * I might have seen Andrews in Mercur's new bank ; I dunned him every time I saw him. I bid off earth work at 35 and rock at 90 cents. My contract was executed at that price. I worked at that price till I made the arrangement with Mr. Mercur. I can't tell when the price was increased to 40 cents and $1. I did not have any esti-

[Haverly *v.* Mercur.]

mates, and did not receive my pay at that price. The engineers made measurements nearly every month. After these measurements were made, I went to Mr. Everett to get my pay. I think I did make frequent complaints to Mr. Everett that Andrews did not pay me regularly and better. I did make complaints to Mercur that Andrews did not pay. Mercur has judgment against me for $600. I gave the note on the 15th of February 1870. This was given in part for money at the time I gave the note, about $200 ; the balance was for money I had had previous to that time. I gave him Andrews's draft for the money got before draft for $375. This draft and the $200 made the $600 note. * * * In March 1867 ; I had the conversation with Mr. Mercur, when he told me to keep an account, he told me at that time that he would pay me or see me paid. I have done all I could to get my pay from Andrews. I think the last time I saw Andrews was in 1868. They owed me $6000 or $7000 at that time. The contract with Mercur was made just after the first slide into the thorough cut. Commenced keeping an account of my own time the 1st of June 1867. * * * I asked Mr. Everett for a statement of the amount that had been paid me. I understood the statement to be correct. * * * The amount paid by Everett to Mix & McCabe was figured in. It was about this time we first talked ; he, Mercur, told me to get all I could out of Andrews and he would pay the balance. It was in the same conversation that he said I should keep on teazing him. I asked him to put it in writing, and he refused to do it, because if he did he would have to secure others. During the progress of this work I asked Mr. Mercur to pay me at different times. He said money was very tight; said that Andrews was slow about selling bonds. I frequently complained to Mercur about Andrews or Whittenhall being slow to pay. In the fall or winter of 1867 I looked over the accounts with Mr. Everett; there was some $8000 due me. Mercur wanted me to take bonds; he did not tell me at what price Andrews would let me have the bonds. Mr. Everett thought there would be money to pay with in the spring. Mr. Mercur told Mix & McCabe that if they would let me have a bill of goods he would see it paid. Mr. Everett paid that bill. It was some time after we made the bargain that Mercur refused to put it in writing."

On re-examination he said. * * * "I recollect going up to Mercur's house with George Neal. When coming down I was complaining of Whittenhall's being a miserable fellow. He said I should keep teazing him, it would not hurt me. He said he had told me before that I should make out an account of my expenditures ; I did make it out and handed it to Mr. Mercur sometime afterwards. * * * I told Mr. Mercur that some people said that a promise to pay was of no avail unless it was put in writing.

[Haverly *v.* Mercur.]

Said he thought his word was good. If he put it in writing the the rest would want him to do it for them."

George B. Neal testified : " I recollect the conversation between Mr. Mercur and Mr. Haverly, as mentioned by him. I heard Mr. Mercur ask Mr. Haverly if he had made out that bill. Mr. Haverly said he had not entirely. Mr. Mercur told him to make out an itemized bill and hand it in so that he could carry it before the board. Mr. Mercur has told me that he would rather see Amasa paid than any of the rest of the contractors."

Charles Chilson testified : " I had a talk with Mercur about the work of Haverly. He asked me if I saw anybody at work there. I told him I did see a few there. I told him the report was that Haverly had got to quit. He said he told him to go on and he should lose nothing. This was in the spring of 1867."

J. S. Campbell testified : " I heard a conversation between Mr. Mercur and Haverly in the bank. It was after they commenced working on the railroad. Mr. Haverly came into the bank and complained to Mr. Mercur that he would have to stop ; that he had no provisions. Mr. Mercur told him that he must not stop ; that he would get him a load of provisions ; asked him if he had a team there. He said that he had a team, and Mercur ordered him to take it around to McCabe & Mix's. During the conversation Mr. Mercur said he would pay him or see him paid, I am not certain which. That was when urging him not to stop. He expressed much anxiety not to have him stop." * * *

William Burdick testified : " I was driving the stage. I recollect when driving of meeting Mr. Mercur at the watering-trough near Wilcox's. Mr. Haverly said to Mr. Mercur that he must have some money or he would have to stop his work. Mr. Mercur told him he must not stop the work, but must keep on and he would pay him or see he had his pay for all he did. I heard a short conversation in the bank between Mr. Mercur and Mr. Haverly. Mr. Haverly told him he must have some money, and Mercur told him he must keep on and he would see that he had his pay."

William Northrup testified : * * * " I was in the bank one day, I think in 1868, in the fore part of November. Mr. Haverly said he had used up all the money he had and he must quit if he could not get means to carry it on. Mercur told him he must not quit, that cut must go on. He told him they wanted to go to laying iron in the spring and that cut was going to bother them, and it must go on. He said he would see that he had his pay or would assist him in getting it."

A. J. Gorsline testified : " I recollect of riding with Mr. Burdick in the stage in November or December 1867. We met Mr. Mercur near by Wilcox's mill, on the turnpike. * * * Haverly got out of the stage. Mercur asked Haverly how he got along. He

[Haverly *v.* Mercur.]

said very slow and poorly, and he would have to stop if he did not
have some pay; said he had no money to pay the men and the
men would not go on without money.    Mercur said, "No, don't
stop, the work must go on, Mr. Haverly, and I will pay you or see
you paid.'   He told him he should not lose a cent, and that he
would be responsible, or words to that effect." * * *

John Sullivan testified : "I heard Mercur say that Haverly said
he could not go on with the work.    He said Haverly must not
quit, but he would see him paid.    He furnished a load of pro-
visions." * * *

There was other evidence of much the same character as the
foregoing; there was evidence also of payments by Everett on
behalf of Whittenhall & Co. to the plaintiff, or on his account,
during the time the work on the contract was progressing, and
after the alleged promise by the defendant.

The plaintiff having closed his case, the defendant moved for a
nonsuit for the reason:—

"That the evidence on the part of the plaintiff shows that the
undertaking of the defendant set forth in his declaration was a
collateral undertaking (not in writing) to plaintiff's contract with
Whittenhall & Co., and is within the Statute of Frauds and Per-
juries, and the plaintiff cannot recover."

The defendant's motion was allowed, and a judgment of nonsuit
entered by the court.    The plaintiff excepted to the decision of
the court ordering the nonsuit; but no motion to take off the non-
suit was made to the court in banc.

The plaintiff took a writ of error, and assigned for error the en-
tering of judgment of nonsuit.

*Watkins & Smith,* for plaintiff in error.—The promise of de-
fendant was to pay his own debt under a contract which he himself
made with plaintiff; it was not to pay a debt of Whittenhall & Co.:
Weyand *v.* Crichfield, 3 Grant 113 ; Malone *v.* Keener, 8 Wright
107 ; Brown on Statute of Frauds 165 ; Johnson *v.* Gilbert, 4
Hill 172 ; Arnold *v.* Stedman, 9 Wright 186 ; Whitcomb *v.*
Kephart, 14 Id. 90 ; Jefferson County *v.* Slagle, 16 P. F. Smith
202.

*Patrick, Overton & Elsbree* and *Peet & Davis,* for defendant in
error.—The uniform construction given to the Statute of Frauds
is to bring every promise made for the payment for the debt or
default of a third person within the statute, except where the
promissor has made the promise upon a consideration to himself,
or upon the receipt of some fund or other security, either from
the debtor or the creditor, charged with the payment of the debt,
so that a trust or duty was created thereby to pay the debt, so that
in making the payment of the debt he was fulfilling an obligation

[Haverly v. Mercur.]

of his own: Williams v. Leper, 3 Burr. 1886; Edwards v. Kelly, 6 M. & S. 204; Castling v. Aubeet, 2 East 325; Bampton v. Paulin, 4 Bing. 264; Walker v. Taylor, 6 Carr. & Paine 752; Stephens v. Pell, 2 Cr. & Mees. 710; Birkmyr v. Darnell, Salkeld 27. While the old debt remains, the new must be regarded as not an original undertaking, and therefore within the statute: 1 Saunders 211, note 1; Goodman v. Chase, 1 B. & A. 297, unless it be an extinguishment of the liability of the original party; Mallory v. Gillett, 21 New York 312.

The consideration must move to the party making the promise, or it is within the statute: Farley v. Cleavland, 4 Conn. 432–439; Nelson v. Boynton, 3 Met. 486; Kingsley v. Balcom, 4 Barbour 131.

Judgment was entered in Supreme Court March 22d, 1875,

PER CURIAM.—It was held at Harrisburg last year, in the case of Eshelman & Herr v. Beecher & Harnish, 26 P. F. Smith 97, that the evidence to change an existing contract relation between the plaintiff and a third party, and to prove a promise by the defendant to pay the debt of another, as a new and original undertaking, and not a contract of suretyship, must be clear and satisfactory; otherwise, the case will fall within the operation of the Statute of Frauds, requiring the promise to be in writing. This is a wholesome rule, without which the statute may be easily evaded, especially since the law has made the plaintiff a witness in his own behalf. Doubtful expressions can easily be made the foundation of a promise and the conscience of the party thus relieved from a conviction of distinct perjury.

Viewing this case in the light of these salutary principles, the evidence is entirely insufficient to raise a promise binding on the defendant without a writing. The plaintiff, a farmer near at hand, had a sub-contract with certain contractors to build two sections of railroad of the Sullivan and Erie Railroad Company, of which the defendant was the president. He had worked under his sub-contract for some time, until he found the contractors failing in payments, and in doubtful circumstances, He mentioned this to the defendant Mercur, who told him he had better not quit; that he was living there and raising his own provisions, and he had better go on and build the road. Mercur took a chair beside him, and said he would tell him what to do—to go on, build the road, keep a strict account, and return it to Mr. Everett, and he (Mercur) would pay him, or see that he was paid, that he should not lose a cent by it—said this was confidential. Haverly continued and finished his work. In so doing he kept on precisely as before; made returns to Everett, who was the agent or superintendent of the contractors, and received his estimates as before, to the amount of $27,392.63, of which only $3000 were paid under the contract

before the alleged assumption of Mercur. The entire work was estimated at $39,332.03. The engineers made the regular monthly estimates resorting (after the land slides) to the pay rolls kept by Haverly, instead of actual measurements. During all this time, the plaintiff, Haverly, pursued Andrews, the assignee of the original contract, incessantly for money; and on one occasion borrowed money of Mercur, giving him his judgment note in $600, to pay a draft of $375 on Andrews, and the remainder in cash, to carry on the work.

Without further detail, it may be said that there was no evidence of abandonment of the plaintiff's sub-contract with the contractors, but he continued to work under it, receiving payments to a large amount under it, and in no single instance receiving payment from Mercur. On one occasion Mercur assisted him to procure a wagon load of provisions, which the evidence shows was not paid for by Mercur, but through Andrews's checks. He complained to Everett that Andrews did not pay him, and told Mercur that Andrews was slow. Mercur said money was tight and Andrews was slow in selling bonds, "and wanted Haverly to take bonds," but, says Haverly, Mercur did not tell me at what price Andrews would let me have the bonds, indicating the understanding of both parties that the money was to come out of the sales of the bonds of the railroad company, and not from Mercur personally. The entire evidence shows that Haverly had not changed his relation under his sub-contract, and that what Mercur did was as president of the company, in endeavoring to push the work to completion, and in this relation to secure Haverly in the fruits of his labor.

When we come to the evidence of the promise, we find it wholly doubtful and unsatisfactory. Haverly, who ought to state clearly, if it were made as claimed, says, he promised " to pay me, or see that I had my pay." Which was it? The subsequent conduct of Haverly clearly indicates the latter. Nor is this an isolated form of expression, for it is several times repeated. Besides, the proof by six witnesses of the plaintiff was in the single form only, to wit, that Mercur would *see* him paid. Then we have Haverly's own interpretation, the result of consultation with others, for he told Mercur that some people said that a promise to pay was of no avail, unless it was put in *writing*. Mercur declined, and said if he put it in writing the rest would want him to do it for them; "if he *secured* one in writing the rest would want him to do the same thing." As corroborative of this, the promise to the merchants who furnished the wagon load of provisions was, that he would *see* them paid, and they were in fact paid through Everett's checks. In all this there is no evidence, either clear or satisfactory, of an absolute promise by Mercur to pay himself, except by way of suretyship. This being the case of a nonsuit, in which the court below were better able to judge of the force of the evidence, the

[Haverly v. Mercur.]

necessity of a clear and preponderating weight of evidence in favor of an absolute, original, personal promise, is greater when we are called upon to reverse the judgment of the court. It should plainly appear to us that the plaintiff had such a case as ought to have gone to a jury. That Mr. Mercur promised the plaintiff to see him paid, and became surety for the railroad company, is beyond a doubt, but that he undertook to bind himself to pay absolutely, as of his own original, personal obligation, does not appear. The statute is therefore a bar to the action. We are referred to the late case of the County of Jefferson v. Slagle, 16 P. F. Smith 202. But that case has not a feature resembling this. There the Slagles refused to let Dickey, the contractor for the court house, have the bricks. They gave evidence that in consequence of this, the county commissioners, in order that the building might go on, and the hands not stand idle, promised the plaintiff absolutely to pay them for the bricks, and that they had a fund of $19,000, held back from Dickey as security for performance, and to which the county could resort. The evidence of several witnesses for the plaintiff was of an absolute promise to pay for the bricks, if the plaintiff would deliver them. This was met by contradictory evidence on the part of the commissioners, and the judge expressly instructed the jury that there could be no recovery, unless the commissioners, as such, expressly promised to pay, and the plaintiff delivered on this promise. The jury found the fact of the absolute promise on behalf of the county, and when the case came into this court, it was said in the opinion, " The contract, as averred in the declaration and found by the jury under the evidence, was not a contract to answer for the debt or default of the contractor, but a direct promise on part of the commissioners to pay for the bricks, in consideration of which the plaintiff agreed to deliver them." In the case before us we have seen there was no abandonment of the original sub-contract, or refusal to go on under it, but a continuation of the work as before, and payments to a large amount made under it, and that there was no clear and satisfactory evidence of an intention to bind Mercur personally, except by way of suretyship, and no sufficient evidence of an absolute contract, or that the plaintff went on with the work, in consideration of such an absolute liability.

This case having been fully argued before us on the merits, without objection to the state of the record, we have discussed it in order to show that it is not taken out of the operation of the Statute of Frauds. But having discovered that the record is not legally before us, it is proper to say that we cannot countenance so loose a practice. The act relating to the District Court of Philadelphia (1 Bright. Dig. 498), requires a motion to set aside the judgment of nonsuit to be made to the court in banc; and a writ of error lies only to the refusal of the court to set it aside.

The purpose is to give the court an opportunity of reconsidering the evidence before the case is removed into this court.   The same powers as to nonsuits are extended to the courts of Common Pleas throughout the state, subject to the same regulations as to writs of error : 2 Bright. Dig. 1168, pl. 28.

No motion to set aside the nonsuit having been made, this writ of error was prematurely taken, and must be quashed.

Writ of error quashed at the costs of the plaintiff.